NATIONAL LABOR RELATIONS BOARD *v.*
WYMAN-GORDON CO.

No. 463.   Argued March 3, 1969.—
Decided April 23, 1969.

760

*Solicitor General Griswold* argued the cause for petitioner. With him on the brief were *Francis X.*

*Beytagh, Jr., Arnold Ordman, Dominick L. Manoli,* and *Norton J. Come.*

*Quentin O. Young* argued the cause and filed a brief for respondent.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

MR. JUSTICE FORTAS announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE WHITE join.

On the petition of the International Brotherhood of Boilermakers and pursuant to its powers under § 9 of the National Labor Relations Act, 49 Stat. 453, 29 U. S. C. § 159, the National Labor Relations Board ordered an election among the production and maintenance employees of the respondent company. At the election, the employees were to select one of two labor unions as their exclusive bargaining representative, or to choose not to be represented by a union at all. In connection with the election, the Board ordered the respondent to furnish a list of the names and addresses of its employees who could vote in the election, so that the unions could use the list for election purposes. The respondent refused to comply with the order, and the election was held without the list. Both unions were defeated in the election.

The Board upheld the unions' objections to the election because the respondent had not furnished the list, and the Board ordered a new election. The respondent again refused to obey a Board order to supply a list of employees, and the Board issued a subpoena ordering the respondent to provide the list or else produce its personnel and payroll records showing the employees' names and addresses. The Board filed an action in the United

States District Court for the District of Massachusetts seeking to have its subpoena enforced or to have a mandatory injunction issued to compel the respondent to comply with its order.

The District Court held the Board's order valid and directed the respondent to comply. 270 F. Supp. 280 (1967). The United States Court of Appeals for the First Circuit reversed. 397 F. 2d 394 (1968). The Court of Appeals thought that the order in this case was invalid because it was based on a rule laid down in an earlier decision by the Board, *Excelsior Underwear Inc.*, 156 N. L. R. B. 1236 (1966), and the *Excelsior* rule had not been promulgated in accordance with the requirements that the Administrative Procedure Act prescribes for rule making, 5 U. S. C. § 553.￭ We granted certiorari to resolve a conflict among the circuits concerning the validity and effect of the *Excelsior* rule. 393 U. S. 932 (1968).[1]

## I.

The *Excelsior* case involved union objections to the certification of the results of elections that the unions

[1] When we granted certiorari, the Fifth Circuit had expressly approved the procedure the Board followed in adopting the *Excelsior* rule. *Howell Refining Co.* v. *NLRB*, 400 F. 2d 213 (1968). Two other circuits had approved enforcement of the *Excelsior* rule without explicitly passing on the correctness of the method by which it was adopted. *NLRB* v. *Hanes Hosiery Division*, 384 F. 2d 188 (C. A. 4th Cir. 1967); *NLRB* v. *Rohlen*, 385 F. 2d 52 (C. A. 7th Cir. 1967). After our grant of certiorari in the present case, three more courts of appeals explicitly upheld the *Excelsior* rule and the procedure by which it was adopted, *NLRB* v. *Beech-Nut Life Savers, Inc.*, 406 F. 2d 253 (C. A. 2d Cir. 1968); *British Auto Parts, Inc.* v. *NLRB*, 405 F. 2d 1182 (C. A. 9th Cir. 1968); *NLRB* v. *Q-T Shoe Mfg. Co.*, 409 F. 2d 1247 (C. A. 3d Cir. 1969); and the Fifth Circuit reaffirmed its earlier holding in *Howell Refining Co., Groendyke Transport, Inc.* v. *Davis*, 406 F. 2d 1158 (1969).

had lost at two companies. The companies had denied the unions a list of the names and addresses of employees eligible to vote. In the course of the proceedings, the Board "invited certain interested parties" to file briefs and to participate in oral argument of the issue whether the Board should require the employer to furnish lists of employees. 156 N. L. R. B., at 1238. Various employer groups and trade unions did so, as *amici curiae.* After these proceedings, the Board issued its decision in *Excelsior.* It purported to establish the general rule that such a list must be provided, but it declined to apply its new rule to the companies involved in the *Excelsior* case. Instead, it held that the rule would apply "only in those elections that are directed, or consented to, subsequent to 30 days from the date of [the] Decision." *Id.,* at 1240, n. 5.

Specifically, the Board purported to establish "a requirement that will be applied in all election cases. That is, within 7 days after the Regional Director has approved a consent-election agreement entered into by the parties . . . , or after the Regional Director or the Board has directed an election . . . , the employer must file with the Regional Director an election eligibility list, containing the names and addresses of all the eligible voters. The Regional Director, in turn, shall make this information available to all parties in the case. Failure to comply with this requirement shall be grounds for setting aside the election whenever proper objections are filed." *Id.,* at 1239–1240.

Section 6 of the National Labor Relations Act empowers the Board "to make . . . , in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this Act." 29 U. S. C. § 156. The Administrative Procedure Act contains specific provisions governing agency rule making, which it defines as "an agency statement of general or particular applicability and fu-

ture effect," 5 U. S. C. § 551 (4).[2]  The Act requires, among other things, publication in the Federal Register of notice of proposed rule making and of hearing; opportunity to be heard; a statement in the rule of its basis and purposes; and publication in the Federal Register of the rule as adopted.  See 5 U. S. C. § 553.  The Board asks us to hold that it has discretion to promulgate new rules in adjudicatory proceedings, without complying with the requirements of the Administrative Procedure Act.

The rule-making provisions of that Act, which the Board would avoid, were designed to assure fairness and mature consideration of rules of general application. See H. R. Rep. No. 1980, 79th Cong., 2d Sess., 21–26 (1946); S. Rep. No. 752, 79th Cong., 1st Sess., 13–16 (1945).  They may not be avoided by the process of making rules in the course of adjudicatory proceedings. There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention.  Apart from the fact that the device fashioned by the Board does not comply with statutory command, it obviously falls short of the substance of the requirements of the Administrative Procedure Act. The "rule" created in *Excelsior* was not published in the Federal Register, which is the statutory and accepted means of giving notice of a rule as adopted; only selected organizations were given notice of the "hearing," whereas notice in the Federal Register would have been general in character; under the Administrative Procedure Act, the terms or substance of the rule would have to be stated in the notice of hearing, and all interested par-

---

[2] We agree with the opinion of Chief Judge Aldrich below that the *Excelsior* rule involves matters of substance and that it therefore does not fall within any of the Act's exceptions.  See 5 U. S. C. § 553 (b) (A).

ties would have an opportunity to participate in the rule making.

The Solicitor General does not deny that the Board ignored the rule-making provisions of the Administrative Procedure Act.[3] But he appears to argue that *Excelsior*'s command is a valid substantive regulation, binding upon this respondent as such, because the Board promulgated it in the *Excelsior* proceeding, in which the requirements for valid adjudication had been met. This argument misses the point. There is no question that, in an adjudicatory hearing, the Board could validly decide the issue whether the employer must furnish a list of employees to the union. But that is not what the Board did in *Excelsior*. The Board did not even apply the rule it made to the parties in the adjudicatory proceeding, the only entities that could properly be subject to the order in that case. Instead, the Board purported to make a rule: *i. e.*, to exercise its quasi-legislative power.

Adjudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein. See H. Friendly, The Federal Administrative Agencies 36–52 (1962).[4] They

---

[3] The Board has never utilized the Act's rule-making procedures. It has been criticized for contravening the Act in this manner. See, *e. g.*, 1 K. Davis, Administrative Law Treatise § 6.13 (Supp. 1965); Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L. J. 729 (1961).

[4] The Solicitor General argues that this Court has previously approved "rules" articulated by the Board in the adjudication of particular cases without questioning the propriety of that procedure. He cites *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793 (1945); *NLRB* v. *A. J. Tower Co.*, 329 U. S. 324 (1946); *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344 (1953); and *Brooks* v. *NLRB*, 348 U. S. 96 (1954). In none of these cases has this Court ruled upon or sanctioned the exercise of quasi-legislative power—*i. e.*, rule making—without compliance with § 6 of the NLRA and the rule-making provisions of the Administrative Procedure Act.

generally provide a guide to action that the agency may be expected to take in future cases. Subject to the qualified role of *stare decisis* in the administrative process, they may serve as precedents. But this is far from saying, as the Solicitor General suggests, that commands, decisions, or policies announced in adjudication are "rules" in the sense that they must, without more, be obeyed by the affected public.

In the present case, however, the respondent itself was specifically directed by the Board to submit a list of the names and addresses of its employees for use by the unions in connection with the election.[5] This direction, which was part of the order directing that an election be held, is unquestionably valid. See, *e. g., NLRB* v. *Waterman S. S. Co.,* 309 U. S. 206, 226 (1940). Even though the direction to furnish the list was followed by citation to *"Excelsior Underwear Inc.,* 156 NLRB No. 111," it is an order in the present case that the respondent was required to obey. Absent this direction by the Board, the respondent was under no compulsion to furnish the list because no statute and no validly adopted rule required it to do so.

Because the Board in an adjudicatory proceeding directed the respondent itself to furnish the list, the decision of the Court of Appeals for the First Circuit must be reversed.[6]

---

[5] In his Decision and Direction of Election, the Regional Director ordered that "[a]n election eligibility list, containing the names and addresses of all the eligible voters, must be filed with the Regional Director within seven (7) days of the date of this Decision and Direction of Election. The Regional Director shall make the list available to all parties to the election. . . ."

[6] Mr. Justice Harlan's dissent argues that because the Board improperly relied upon the *Excelsior* "rule" in issuing its order, we are obliged to remand. He relies on *SEC* v. *Chenery Corp.,* 318 U. S. 80 (1943). To remand would be an idle and useless formality. *Chenery* does not require that we convert judicial review

## II.

The respondent also argues that it need not obey the Board's order because the requirement of disclosure of employees' names and addresses is substantively invalid. This argument lacks merit. The objections that the respondent raises to the requirement of disclosure were clearly and correctly answered by the Board in its *Excelsior* decision. All of the United States Courts of Appeals that have passed on the question have upheld the substantive validity of the disclosure requirement,[7] and the court below strongly intimated a view that the requirement was substantively a proper one, 397 F. 2d, at 396.

We have held in a number of cases that Congress granted the Board a wide discretion to ensure the fair and free choice of bargaining representatives. See, *e. g., NLRB* v. *Waterman S. S. Co., supra,* at 226; *NLRB* v. *A. J. Tower Co.,* 329 U. S. 324, 330 (1946). The disclosure requirement furthers this objective by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses. It is for the Board and not for this Court to weigh against this interest the asserted interest of employees in avoiding the problems that union solicitation may present.

---

of agency action into a ping-pong game. In *Chenery,* the Commission had applied the wrong standards to the adjudication of a complex factual situation, and the Court held that it would not undertake to decide whether the Commission's result might have been justified on some other basis. Here, by contrast, the substance of the Board's command is not seriously contestable. There is not the slightest uncertainty as to the outcome of a proceeding before the Board, whether the Board acted through a rule or an order. It would be meaningless to remand.

[7] See *NLRB* v. *J. P. Stevens & Co.,* 409 F. 2d 1207 (C. A. 4th Cir. 1969), and the cases cited in n. 1, *supra.*

## III.

The respondent contends that even if the disclosure requirement is valid, the Board lacks power to enforce it by subpoena. Section 11 (1) of the National Labor Relations Act provides that the Board shall have access to "any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question," and empowers the Board to issue subpoenas "requiring the attendance and testimony of witnesses or the production of any evidence in such proceeding or investigation." Section 11 (2) gives the district courts jurisdiction, upon application by the Board, to issue an order requiring a person who has refused to obey the Board's subpoena "to appear before the Board . . . there to produce evidence if so ordered, or there to give testimony touching the matter under investigation or in question . . . ." 29 U. S. C. §§ 161 (1), (2).

The respondent takes the position that these statutory provisions do not give the Board authority to subpoena the lists here in question because they are not "evidence" within the meaning of the statutory language. The District Court held, however, that "in the context of § 11 of the Act, 'evidence' means not only proof at a hearing but also books and records and other papers which will be of assistance to the Board in conducting a particular investigation." [8] The courts of appeals that have passed on the question have construed the term "evidence" in a similar manner. *NLRB* v. *Hanes Hosiery Division*, 384 F. 2d 188, 191–192 (C. A. 4th Cir. 1967). See *NLRB* v. *Rohlen*, 385 F. 2d 52, 55–58 (C. A. 7th Cir. 1967); *NLRB* v. *Beech-Nut Life Savers, Inc.*, 406 F. 2d 253, 259 (C. A. 2d Cir. 1968); *British Auto Parts, Inc.* v.

---

[8] 270 F. Supp., at 285. The Court of Appeals did not reach the issue whether the Board could subpoena the lists in question.

*NLRB,* 405 F. 2d 1182, 1184 (C. A. 9th Cir. 1968); *NLRB* v. *Q–T Shoe Mfg. Co.,* 409 F. 2d 1247 (C. A. 3d Cir. 1969). We agree that the list here in issue is within the scope of § 11 so that the Board's subpoena power may be validly exercised.

The judgment of the Court of Appeals is reversed, and the case is remanded to the District Court with directions to reinstate its judgment.

*It is so ordered.*

MR. JUSTICE BLACK, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, concurring in the result.

I agree with Parts II and III of the prevailing opinion of MR. JUSTICE FORTAS, holding that the *Excelsior* requirement [1] that an employer supply the union with the names and addresses of its employees prior to an election is valid on its merits and can be enforced by a subpoena. But I cannot subscribe to the criticism in that opinion of the procedure followed by the Board in adopting that requirement in the *Excelsior* case, 156 N. L. R. B. 1236 (1966). Nor can I accept the novel theory by which the opinion manages to uphold enforcement of the *Excelsior* practice in spite of what it considers to be statutory violations present in the procedure by which the requirement was adopted. Although the opinion is apparently

---

[1] This requirement first announced in the *Excelsior* case, 156 N. L. R. B. 1236 (1966), has often been referred to by the Board, the lower courts, and the commentators as "the *Excelsior* rule." I understand the use of the word "rule" in this context to imply simply that the requirement is a rule of law such as would be announced in a court opinion and not necessarily that it is the kind of "rule" required to be promulgated in accordance with the "rule-making" procedures of the Administrative Procedure Act. For the sake of clarity, however, I have chosen in this opinion to avoid use of the word "rule" when referring to the procedure required by the *Excelsior* decision.

intended to rebuke the Board and encourage it to follow the plurality's conception of proper administrative practice, the result instead is to free the Board from all judicial control whatsoever regarding compliance with procedures specifically required by applicable federal statutes such as the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*, and the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.* Apparently, under the prevailing opinion, courts must enforce any requirement announced in a purported "adjudication" even if it clearly was not adopted as an incident to the decision of a case before the agency, and must enforce "rules" adopted in a purported "rule making" even if the agency materially violated the specific requirements that Congress has directed for such proceedings in the Administrative Procedure Act. I for one would not give judicial sanction to any such illegal agency action.

In the present case, however, I am convinced that the *Excelsior* practice was adopted by the Board as a legitimate incident to the adjudication of a specific case before it, and for that reason I would hold that the Board properly followed the procedures applicable to "adjudication" rather than "rule making." Since my reasons for joining in reversal of the Court of Appeals differ so substantially from those set forth in the prevailing opinion, I will spell them out at some length.

Most administrative agencies, like the Labor Board here, are granted two functions by the legislation creating them: (1) the power under certain conditions to make rules having the effect of laws, that is, generally speaking, quasi-legislative power; and (2) the power to hear and adjudicate particular controversies, that is quasi-judicial power. The line between these two functions is not always a clear one and in fact the two functions merge at many points. For example, in exercising its quasi-judicial function an agency must frequently

decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems. If the agency decision reached under the adjudicatory power becomes a precedent, it guides future conduct in much the same way as though it were a new rule promulgated under the rule-making power, and both an adjudicatory order and a formal "rule" are alike subject to judicial review. Congress gave the Labor Board both of these separate but almost inseparably related powers.[2] No language in the National Labor Relations Act requires that the grant or the exercise of one power was intended to exclude the Board's use of the other.

Nor does any language in the Administrative Procedure Act require such a conclusion. The Act does specify the procedure by which the rule-making power is to be exercised, requiring publication of notice for the benefit of interested parties and provision of an opportunity for them to be heard, and, after establishment of a rule as provided in the Act, it is then to be published in the Federal Register. Congress had a laudable purpose in prescribing these requirements, and it was evidently contemplated that administrative agencies like the Labor Board would follow them when setting out to announce a new rule of law to govern parties in the future. In this same statute, however, Congress also conferred on the affected administrative agencies the power to proceed by adjudication, and Congress specified a distinct procedure by which this adjudicatory power is to be exercised.[3] The Act defines "adjudication" as

---

[2] See National Labor Relations Act §§ 6, 9 (c) (1), 10; 29 U. S. C. §§ 156, 159 (c) (1), 160.

[3] The procedure to be followed in "adjudication," which includes notice of the issues, an opportunity for responsive pleadings, a hear-

"agency process for the formulation of an order," and "order" is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U. S. C. §§ 551 (7), (6). Thus, although it is true that the adjudicatory approach frees an administrative agency from the procedural requirements specified for rule making, the Act permits this to be done whenever the action involved can satisfy the definition of "adjudication" and then imposes separate procedural requirements that must be met in adjudication. Under these circumstances, so long as the matter involved can be dealt with in a way satisfying the definition of either "rule making" or "adjudication" under the Administrative Procedure Act, that Act, along with the Labor Relations Act, should be read as conferring upon the Board the authority to decide, within its informed discretion, whether to proceed by rule making or adjudication. Our decision in *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947), though it did not involve the Labor Board or the Administrative Procedure Act, is nonetheless equally applicable here. As we explained in that case, "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.*, at 203.

In the present case there is no dispute that all the procedural safeguards required for "adjudication" were fully satisfied in connection with the Board's *Excelsior* decision, and it seems plain to me that that decision did

ing, and decision, is specified in 5 U. S. C. §§ 554, 556, and 557. The Administrative Procedure Act expressly exempts proceedings for "the certification of worker representatives" from these requirements, 5 U. S. C. §§ 554 (a) (6), 556 (a), 557 (a), and these proceedings are therefore governed only by the requirements specified in the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*

constitute "adjudication" within the meaning of the Administrative Procedure Act, even though the requirement was to be prospectively applied. See *Great Northern R. Co.* v. *Sunburst Co.*, 287 U. S. 358 (1932). The Board did not abstractly decide out of the blue to announce a brand new rule of law to govern labor activities in the future, but rather established the procedure as a direct consequence of the proper exercise of its adjudicatory powers. Sections 9 (c)(1) and (2) of the Labor Relations Act empower the Board to conduct investigations, hold hearings, and supervise elections to determine the exclusive bargaining representative that the employees wish to represent them. This is a key provision of the plan Congress adopted to settle labor quarrels that might interrupt the free flow of commerce. A controversy arose between the Excelsior Company and its employees as to the bargaining agent the employees desired to act for them. The Board's power to provide the procedures for the election was invoked, an election was held, and the losing unions sought to have that election set aside. Undoubtedly the Board proceeding for determination of whether to confirm or set aside that election was "agency process for the formulation of an order" and thus was "adjudication" within the meaning of the Administrative Procedure Act.

The prevailing opinion seems to hold that the *Excelsior* requirement cannot be considered the result of adjudication because the Board did not apply it to the parties in the *Excelsior* case itself, but rather announced that it would be applied only to elections called 30 days after the date of the *Excelsior* decision. But the *Excelsior* order was nonetheless an inseparable part of the adjudicatory process. The principal issue before the Board in the *Excelsior* case was whether the election should be set aside on the ground, urged by the unions, that the employer had refused to make the employee lists avail-

able to them.   See 156 N. L. R. B., at 1236–1238.   The Board decided that the election involved there should not be set aside and thus rejected the contention of the unions.   In doing so, the Board chose to explain the reasons for its rejection of their claim, and it is this explanation, the Board's written opinion, which is the source of the *Excelsior* requirement.   The Board's opinion should not be regarded as any less an appropriate part of the adjudicatory process merely because the reason it gave for rejecting the unions' position was not that the Board disagreed with them as to the merits of the disclosure procedure but rather, see 156 N. L. R. B., at 1239, 1240, n. 5, that while fully agreeing that disclosure should be required, the Board did not feel that it should upset the Excelsior Company's justified reliance on previous refusals to compel disclosure by setting aside this particular election.

Apart from the fact that the decisions whether to accept a "new" requirement urged by one party and, if so, whether to apply it retroactively to the other party are inherent parts of the adjudicatory process, I think the opposing theory accepted by the Court of Appeals and by the prevailing opinion today is a highly impractical one.   In effect, it would require an agency like the Labor Board to proceed by adjudication only when it could decide, *prior* to adjudicating a particular case, that any new practice to be adopted would be applied retroactively.   Obviously, this decision cannot properly be made until all the issues relevant to adoption of the practice are fully considered in connection with the final decision of that case.   If the Board were to decide, after careful evaluation of all the arguments presented to it in the adjudicatory proceeding, that it might be fairer to apply the practice only prospectively, it would be faced with the unpleasant choice of either starting all

over again to evaluate the merits of the question, this time in a "rule-making" proceeding, or overriding the considerations of fairness and applying its order retroactively anyway, in order to preserve the validity of the new practice and avoid duplication of effort. I see no good reason to impose any such inflexible requirement on the administrative agencies.

For all of the foregoing reasons I would hold that the Board acted well within its discretion in choosing to proceed as it did, and I would reverse the judgment of the Court of Appeals on this basis.

Mr. Justice Douglas, dissenting.

The Administrative Procedure Act, 5 U. S. C. § 553 (b) provides that general notice "of proposed rule making" shall be published in the Federal Register. Public participation—in essence a hearing—is provided, § 553 (c). And "interested" persons are given the right to petition for the issuance, amendment, or repeal of a rule, § 553 (c).

In *Excelsior Underwear Inc.*, 156 N. L. R. B. 1236, the Board in 1966 decided (1) that an employer would be required to furnish the Regional Director, prior to the conducting of a representation election, the names and addresses of the eligible voters, which list would then be made available to all contestants in the election, but (2) that this requirement would apply only prospectively, to all elections directed or consented to subsequent to 30 days after the date of its decision there.

The notice and hearing procedure prescribed by § 553 (b) was not followed; and in this case, an election was directed seven months after the *Excelsior* decision, the Board applying the *Excelsior* rule.

I am willing to assume that, if the Board decided to treat each case on its special facts and perform its adju-

dicatory function in the conventional way, we should have no difficulty in affirming its action. The difficulty is that it chose a different course in the *Excelsior* case and, having done so, it should be bound to follow the procedures prescribed in the Act as my Brother HARLAN has outlined them. When we hold otherwise, we let the Board "have its cake and eat it too."

The Committee reports make plain that the Act "provides quite different procedures for the 'legislative' and 'judicial' functions of administrative agencies." S. Rep. No. 752, 79th Cong., 1st Sess., 7; H. R. Rep. No. 1980, 79th Cong., 2d Sess., 17.

Section 553 (b)(3) provides in part:

"Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."

We need not stop to inquire what the word "procedure" in that context embraces. For § 553 (d) provides, with exceptions not material [1] here that:

"The required publication or service of a substantive rule shall be made not less than 30 days before its effective date . . . ."

---

[1] The rule-making provision does not apply to

"(1) a military or foreign affairs function of the United States; or

"(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U. S. C. § 553 (a).

These exceptions exclude, *inter alia*, the National Forest Service, the National Park System, the Bureau of Land Management, and other agencies dealing with "public property" such as the Interior Department and its leases of off-shore oil properties.

For a compilation of federal agency rules on rule making see J. Pike & H. Fischer, Administrative Law (2d series 1952).

The Board apparently decided the *Excelsior* case with § 553 (d) in mind, for it made the proposed new rule effective after 30 days. The House report states that § 553 (d) (which was § 4 (c) in its draft) "does not provide procedures alternative to notice and other public proceedings required by the prior sections." *Id.*, at 25. And that report added, "It will afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt." *Ibid.* And see S. Rep., *supra,* at 15.

The "substantive" rules described by § 553 (d) may possibly cover "adjudications," even though they represent performance of the "judicial" function. But it is no answer to say that the order under review was "adjudicatory." For as my Brother HARLAN says, an agency is not adjudicating when it is making a rule to fit future cases. A rule like the one in *Excelsior* is designed to fit all cases at all times. It is not particularized to special facts. It is a statement of far-reaching policy covering all future representation elections.

It should therefore have been put down for the public hearing prescribed by the Act.

The rule-making procedure performs important functions. It gives notice to an entire segment of society of those controls or regimentation that is forthcoming. It gives an opportunity for persons affected to be heard. Recently the proposed Rules of the Federal Highway Administration governing the location and design of freeways, 33 Fed. Reg. 15663, were put down for a hearing; and the Governor of every State appeared or sent an emissary. The result was a revision of the Rules before they were promulgated. 34 Fed. Reg. 727.

That is not an uncommon experience. Agencies discover that they are not always repositories of ultimate

wisdom; they learn from the suggestions of outsiders and often benefit from that advice. See H. Friendly, The Federal Administrative Agencies 45 (1962).

This is a healthy process that helps make a society viable. The multiplication of agencies and their growing power make them more and more remote from the people affected by what they do and make more likely the arbitrary exercise of their powers. Public airing of problems through rule making makes the bureaucracy more responsive to public needs and is an important brake on the growth of absolutism in the regime that now governs all of us.

Many federal agencies touch on numerous aspects of the lives of the poor. Rule making for this group is discussed in Bonfield, Representation for the Poor in Federal Rulemaking, 67 Mich. L. Rev. 511, 512 (1969):

> "An agency promulgating rules affecting the poor cannot assume that it automatically knows what is best for such people. Government administrators are usually persons with middle-class backgrounds, experiences, and associations; therefore, they tend to have middle-class viewpoints, orientations, and understandings. This means that the personnel of federal agencies may be expected to reflect more accurately the interests of the affluent than those of the economically underprivileged. Consequently, there is a special reason for concern when, as is now the case, the interests of poor people are inadequately represented in the rulemaking process."

While that suggestion may not be relevant to the present labor-management area and the sophisticated opponents with which this case is concerned, it does illustrate that when we are lax and allow federal agencies to play fast and loose with rule making, we set a precedent with dangerous repercussions.

It has been stated that "the survival of a questionable rule seems somewhat more likely when it is submerged in the facts of a given case" than when rule making is used. See Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921, 946–947 (1965). Moreover, "agencies appear to be freer to disregard their own prior decisions than they are to depart from their regulations." *Id.*, at 947. Failure to make full use of rule-making power is attributable at least in part "to administrative inertia and reluctance to take a clear stand." *Id.*, at 972.

Rule making is no cure-all; but it does force important issues into full public display and in that sense makes for more responsible administrative action.

I would hold the agencies governed by the rule-making procedure strictly to its requirements and not allow them to play fast and loose as the National Labor Relations Board apparently likes to do.[2]

As stated by the Court of Appeals, the procedure used in the *Excelsior* case plainly flouted the Act:

"Recognizing the problem to be one affecting more than just the parties before it, the Board chose to solicit the assistance of selected amici curiae, and, ultimately, to establish a rule which not only did not apply to the parties before it, but did not take effect for thirty days. In so doing we consider that

[2] "The NLRB has never used its rule-making power; it misuses the methods of adjudication for making rules, and it uses press releases not published in the Federal Register, for announcing policies that ought to be embodied in formal rules. It seems to be violating § 3 and § 4 of the Administrative Procedure Act, and the result in some instances is serious injustice." 1 K. Davis, Administrative Law Treatise § 6.13 (Supp. 1965). And see Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L. J. 729 (1961).

the Board, to put it bluntly, designed its own rule-making procedure, adopting such part of the Congressional mandate as it chose, and rejecting the rest." 397 F. 2d 394, 396–397.

I would affirm the judgment.

MR. JUSTICE HARLAN, dissenting.

The language of the Administrative Procedure Act does not support the Government's claim that an agency is "adjudicating" when it announces a rule which it refuses to apply in the dispute before it. The Act makes it clear that an agency "adjudicates" only when its procedures result in the "formulation of an *order.*" 5 U. S. C. § 551 (7). (Emphasis supplied.) An "order" is defined to include "the whole or a *part* of a final disposition . . . of an agency *in a matter other than rule making . . . .*" 5 U. S. C. § 551 (6). (Emphasis supplied.) This definition makes it apparent that an agency is not adjudicating when it is making a rule, which the Act defines as "an agency statement of general or particular applicability and *future effect . . . .*" 5 U. S. C. § 551 (4). (Emphasis supplied.) Since the Labor Board's *Excelsior* rule was to be effective only 30 days after its promulgation, it clearly falls within the rule-making requirements of the Act.[1]

Nor can I agree that the natural interpretation of the statute should be rejected because it requires the agency to choose between giving its rules immediate effect or initiating a separate rule-making proceeding. An agency chooses to apply a rule prospectively only because it represents such a departure from pre-existing under-

---

[1] For the reasons advanced by Chief Judge Aldrich in his opinion below, 397 F. 2d 394, I think it clear that the *Excelsior* rule involves matters of substance and not procedure, and so does not fall within the exception created by 5 U. S. C. § 553 (b) (A) of the Act.

standings that it would be unfair to impose the rule upon the parties in pending matters. But it is precisely in these situations, in which established patterns of conduct are revolutionized, that rule-making procedures perform the vital functions that my Brother DOUGLAS describes so well in a dissenting opinion with which I basically agree.

Given the fact that the Labor Board has promulgated a rule in violation of the governing statute, I believe that there is no alternative but to affirm the judgment of the Court of Appeals in this case. If, as the plurality opinion suggests, the NLRB may properly enforce an invalid rule in subsequent adjudications, the rule-making provisions of the Administrative Procedure Act are completely trivialized. Under today's prevailing approach, the agency may evade the commands of the Act whenever it desires and yet coerce the regulated industry into compliance. It is no answer to say that "respondent was under no compulsion to furnish the list because no statute and no validly adopted rule required it to do so," *ante,* at 766, when the Labor Board was threatening to issue a subpoena which the courts would enforce. In what other way would the administrative agency compel obedience to its invalid rule?

One cannot always have the best of both worlds. Either the rule-making provisions are to be enforced or they are not. Before the Board may be permitted to adopt a rule that so significantly alters pre-existing labor-management understandings, it must be required to conduct a satisfactory rule-making proceeding, so that it will have the benefit of wide-ranging argument before it enacts its proposed solution to an important problem.

In refusing to adopt this position, the prevailing opinion not only undermines the Administrative Procedure Act, but also compromises the most basic principles governing judicial review of agency action estab-

lished in our past decisions. This Court's landmark opinion in *SEC* v. *Chenery Corp.*, 318 U. S. 80, 94 (1943), makes it clear that we are obliged to remand a case if the agency has relied upon an improper reason to justify its action:

> "If the action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law. In either event the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."

*Chenery*'s teachings are applicable here. The Regional Office that issued the order under review refused to consider the merits of the arguments against the *Excelsior* rule which were raised by Wyman-Gordon on the ground that they had been rejected by the Board in the *Excelsior* case itself:

> "[I]t is well known that *Excelsior* issued only after oral argument and briefs, including *amicus curiae* briefs by interested parties. The Board has considered arguments such as those made here and nevertheless established the requirement embodied in *Excelsior* and the undersigned [Acting Regional Director] is bound by it." Appendix 33.

The Board denied review of this decision on the ground that "it raises no substantial issues warranting review." Appendix 35.

Since the major reason the Board has given in support of its order is invalid, *Chenery* requires remand. See also *Bell* v. *United States,* 366 U. S. 393, 412–413 (1961); *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 167–168 (1962); cf. *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 196–197 (1941). The prevailing opinion explains its departure from our leading decisions in this area on the ground that: "There is not the slightest uncertainty as to the outcome of [this] proceeding" on remand. *Ante,* n. 6, at 767. I can perceive no justification whatever for this assertion. Since the *Excelsior* rule was invalidly promulgated, it is clear that, at a minimum, the Board is obliged on remand to recanvass all of the competing considerations before it may properly announce its decision in this case.[2] We cannot know what the outcome of such a reappraisal will be. Surely, it cannot be stated with any degree of certainty that the Board will adopt precisely the same solution as the one which was embraced in *Excelsior.* The plurality simply usurps the function of the National Labor Relations Board when it says otherwise.

I would affirm the judgment of the Court of Appeals.

---

[2] As I have indicated, *supra,* at 781, I would go further and require the Board to initiate a new rule-making proceeding where, as here, it has previously recognized that the proposed new rule so departs from prior practices that it cannot fairly be applied retroactively. In the absence of such a proceeding, the administrative agency must be obliged to follow its earlier decisions which did not require employers to furnish *Excelsior* lists to unions during organizing campaigns.