936 F.2d 1310
 290 U.S.App.D.C. 253
 UNION PACIFIC RESOURCES COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Amoco Production Company, Undersigned Producers, Arkla
Exploration Company, Conoco, Inc., Exxon Corporation,
Coastal Gas Marketing Company, Colorado Interstate Gas
Company, Natural Gas Pipeline Company of America, Intervenors.
ASHLAND EXPLORATION, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Undersigned Producers, Arkla Exploration Company, Exxon
Corporation, Coastal Gas Marketing Company,
Colorado Interstate Gas Company, Natural
Gas Pipeline Company of
America, Intervenors.
 Nos. 90-1370, 90-1378.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued May 20, 1991.
Decided June 25, 1991.
 
 Petitions for Review of an Order of the Federal Energy Regulatory Commission.
 Richard E. Powers, Jr. with whom Steven A. Adducci for Ashland Exploration, Inc., Kerry R. Brittain, Philip D. Gettig, David B. Robinson and Andrew S. Newman for Union Pacific Resources Co., were on the joint brief, for petitioners in Nos. 90-1370 and 90-1378. John K. McDonald also entered an appearance for petitioner.
 Jill Hall, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Joseph S. Davies, Deputy Sol. and Timm L. Abendroth, Atty., F.E.R.C., were on the brief, for respondent in Nos. 90-1370 and 90-1378. Jerome M. Feit, Atty., F.E.R.C., also entered an appearance for respondent.
 
 
 1
 John E. Dickinson, with whom Carolyn S. Hazel for Conoco, Inc., Douglas W. Rasch for Exxon Corp., Paul F. O'Konski and R.C. Burton for Mitchell Energy Corp., Marge O'Connor for Mobil Natural Gas, Inc., Michael L. Pate for Oxy USA, Inc., Larry Pain and Luke A. Mickum for Phillips Petroleum Co. and Phillips 66 Natural Gas Co., Mickey Jo Lawrence for Texaco, Inc., and Timothy J. Jacquet for Union Texas Petroleum, were on the joint brief, for intervenors Undersigned Producers in Nos. 90-1370 and 90-1378. Gerald P. Thurmond for Chevron, USA, Bruce A. Connell for Conoco, Inc., and C. Roger Hoffman for Exxon Corp. also entered appearances for intervenor Undersigned Producers.
 
 
 2
 Andrea Studzinski and Paul E. Goldstein, Lombard, Ill., entered appearances, for intervenor Natural Gas Pipeline Co. of America in Nos. 90-1370 and 90-1378.
 
 
 3
 Jack M. Wilhelm entered an appearance for intervenor Amoco Production Co. in No. 90-1370.
 
 
 4
 James J. Holcker entered an appearance for intervenor Arkla Exploration Co. in Nos. 90-1370 and 90-1378.
 
 
 5
 G. Mark Cook, Elizabeth Mack, Washington, D.C., and Eric B. Brown, Indianapolis, Ind., entered appearances, for intervenor Coastal Gas Marketing in Nos. 90-1370 and 90-1378.
 
 
 6
 Daniel F. Collins, Katharine L. Henry and James Howard, Washington, D.C., entered appearances, for intervenor Colo. Interstate Gas Co. in Nos. 90-1370 and 90-1378.
 
 
 7
 Before SILBERMAN, WILLIAMS and THOMAS, Circuit Judges.
 
 
 8
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 9
 Effective January 1, 1993 the Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101-60, 103 Stat. 157 (1989), repeals all of the price controls imposed by the Natural Gas Policy Act of 1978, 15 U.S.C. Sec. 3301 et seq. (1988), on "first sales" (typically wellhead sales) of natural gas. It also provides for earlier decontrol of certain wellhead sales by adding Sec. 121(f) to the NGPA, 15 U.S.C.A. Sec. 3331(f) (Supp.1991). In dispute here is new subsection 121(f)(2):
 
 
 10
 (2) Expiring or terminating contracts.--In the case of natural gas to which a first sale contract applies on [the date of enactment of the Decontrol Act], but to which such contract ceases to apply after such date, [the NGPA price ceilings] shall not apply to any first sale of such natural gas delivered after such contract ceases to apply.
 
 
 11
 15 U.S.C.A. Sec. 3331(f)(2) (Supp.1991). The final sentence of the added Sec. 121(f) embellishes the concept of "apply", stating that for purposes of the subsection
 
 
 12
 a first sale contract applies to natural gas when the seller has a contractual obligation to deliver such natural gas under such contract.
 
 
 13
 15 U.S.C.A. Sec. 3331(f) (Supp.1991).
 
 
 14
 The Federal Energy Regulatory Commission has read the provision as decontrolling gas that has been temporarily released from a pre-enactment contract (i.e., a contract in effect on the date of enactment of the Decontrol Act) and is then sold to a new purchaser under a post-enactment contract. Order No. 523, Order Implementing the Natural Gas Wellhead Decontrol Act of 1989, FERC Stats. and Regs. p 30,887 (1990); Order No. 523-A, 52 FERC p 61,013 (1990) (Order Denying Rehearing). Petitioners challenging the decision are producers of natural gas that is deregulated under the Commission's view. They oppose the ruling because for gas sold before December 31, 1990, they were entitled to tax credits on their production of "tight formation" gas only if the gas was subject to federal price controls. See Sec. 29(c)(2)(B)(i) of the Internal Revenue Code, 26 U.S.C. Sec. 29(c)(2)(B)(i) (1988).[1]
 
 
 15
 Because we find the Commission's interpretation of Sec. 121(f) reasonable, we deny the petitions for review and affirm Orders No. 523 and No. 523-A.
 
 
 16
 * * *
 
 
 17
 The apparent logic of the Decontrol Act is to achieve full decontrol by January 1, 1993, but to accelerate the process where doing so will not injure expectations based on pre-enactment contracts.[2] As we have seen, subsection 121(f)(2) addresses contracts that cease to apply during the transition period. Subsection 121(f)(1) provides immediate decontrol for gas to which no first sale contract applies on the date of enactment, and subsection 121(f)(3) does so where buyer and seller have agreed (after a specific date in 1989) that the gas should not be subject to the wellhead ceilings.
 
 
 18
 The legislative history confirms this view of Congress's animating principle. A Senate Report states broadly, "Wellhead sales of gas subject to a contract entered into after the date of enactment are decontrolled." S.Rep. No. 38, 101st Cong., 1st Sess. at 7 (1989); see also id. ("At such time as the seller is no longer contractually obligated to continue delivering the gas, that gas is decontrolled.... Many different factors can combine to produce this result.... The bill focuses on the result, not how it is reached.") (emphasis added); H.R.Rep. No. 29, 101st Cong., 1st Sess. at 5 (1989), U.S.Code Cong. & Admin.News 1989, pp. 51, 54 (similar). Against its recognition that wellhead price controls "frustrate[ ] rational decisions to produce on the basis of real economic cost", S.Rep. No. 38, supra, at 4, Congress balanced expectations based upon existing contracts and their interaction with the price ceilings,[3] observing that "no provision of this bill ... invalidates, abrogates or otherwise mandates the renegotiation of existing wellhead sales contracts", id. at 8.
 
 
 19
 As a pure matter of language, the Commission's reading of the statute readily fits its terms, though there is an ambiguity in Sec. 121(f)'s references to "natural gas", "such natural gas" and "such gas". If these refer to the particular molecules of gas being sold at a given time, as the Commission implicitly held, then deliveries of gas made by virtue of a temporary post-enactment release are not governed by a pre-enactment contract (and are thus decontrolled). For the petitioners to prevail, the terms must refer to the total quantity of gas committed under a pre-enactment contract, so that such a contract "applies" to any gas sold on a particular day if it still applies to any of the reserves that the contract originally committed.
 
 
 20
 Petitioners offer no theory of congressional purpose that would support their reading. The legislative history, however, offers them some help. One sentence reads as follows:
 
 
 21
 Consequently, in a case where the seller has been released temporarily from its delivery obligation to the original buyer, but there remains an underlying contractual obligation to deliver gas when the release period ends, neither the delivery of the released gas nor the delivery of the gas covered by the underlying contractual obligation is decontrolled.
 
 
 22
 S.Rep. No. 39, 101st Cong., 1st Sess. at 13 (1989).
 
 
 23
 The Commission suggests, however, that the passage as a whole supports its interpretation. It notes that the sentence was part of a broader discussion aimed at assuring that the Decontrol Act would not abrogate or alter any pre-enactment contract. Thus, the quoted language (in its view) stands for the proposition that the bill would not automatically decontrol gas temporarily released before the date of enactment; it would do so only as to sales of released gas pursuant to agreements entered into after enactment, when both parties to the new contract could be presumed to be aware of the Decontrol Act. Although the Commission's analysis leaves us less than thoroughly convinced as to the meaning of the sentence, it does undercut petitioners' view that the sentence--despite the existence of a logically coherent alternative view entirely consistent with the statute itself--represents an explicit congressional answer to the question. Compare Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).
 
 
 24
 Petitioners also point out that Congress was sensitive to the tax implications of its work, the very point that accounts for their present challenge. The Senate Committee did declare that it did "not intend for its approval of [the Decontrol Act], including repeal of the NGPA sections referenced in section 29 [of the Internal Revenue Code], to reflect an adverse judgment by the Committee as to the merits of tax credits for any categories of natural gas production that might be affected by such action." See S.Rep. No. 38, supra, at 9. (As we noted above, Sec. 29 provided tax credits for "tight formation" gas only so long as it was subject to continued price regulation.)
 
 
 25
 Congress's alertness to the tax credit issue, however, is not the same as a determination that the Decontrol Act should have no effect on the credits. In fact, Senator Wallop of Wyoming explicitly recognized the adverse effect in a separate statement:
 
 
 26
 Unfortunately, and quite unintentionally, the decontrol legislation currently before the committee could impact the section 29 credit ... First, the legislation removes all price controls, thus rendering tight formation gas ineligible for the section 29 credit....
 
 
 27
 S.Rep. No. 38, supra, at 35 (statement of Senator Wallop). Moreover, the full Congress has since recognized the impact of the Decontrol Act, amending the tax code to remove the requirement of price regulation (for gas produced after December 31, 1990). See Section 11501(b)(2) of the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101-508, 104 Stat. 1388 (1990), codified at 26 U.S.C.A. Sec. 29(c)(2)(B)(i) (Supp.1991).
 
 
 28
 Petitioners' tax-driven view would twist the statute. In order to address a tax problem that affects only a tiny subset of price-controlled gas,[4] it would read the statute as maintaining price controls on all temporarily released gas, though nothing in the statute's basic structure or theory supports that reading.
 
 
 29
 In sum, then, the petitioners are able to point only to a single sentence of legislative history that seems to support their reading of Sec. 121(f)(2), plus a vague aura of congressional concern about loss of tax credits. When these points are balanced against the availability of a reading that implements a coherent view of the statute (a view, moreover, reflected in the legislative history and statutory language), and the explicit congressional recognition that the bill would have unsought effects on tax credits, they seem clearly inadequate to render the Commission's reading unreasonable. Thus, even if the Commission's reading does not capture the "clear" "intent of Congress", Chevron, 467 U.S. at 842, 104 S.Ct. at 2781, which would require its adoption, it is surely a reasonable one to which we must defer, id. at 843-45, 104 S.Ct. at 2781-83.
 
 
 30
 * * *
 
 
 31
 The petitioners also complain that the Commission provided inadequate notice and opportunity to comment on the released gas issue. They note that the Notice of Proposed Rulemaking made no reference at all to the regulatory status of temporarily released gas.
 
 
 32
 The Commission's initial Notice was perhaps marginally adequate under the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1988). It stated that the Commission was "propos[ing] to amend its regulations to reflect the provisions of the [Decontrol] Act that decontrol gas prior to January 1, 1993." 54 Fed.Reg. 51,902, 51,903/2 (1989). It also stated the Commission view that "[g]as subject to post-enactment contracts is also decontrolled." Id. Moreover, it specifically noted the tax credit issue, id. at 51,903/3, which is of such concern to petitioners as producers of "tight formation" gas. Despite the silence on the specific question of temporarily released gas, parties on both sides of the issue, including one of the petitioners, submitted in-depth comments on the issue, though, to be sure, all but one of these were late-filed. See Joint Appendix at 147-48 (comments of Texas Gas Transmission Corp.); id. at 181-84 (comments of Marathon Oil Company); id. at 196-99 (comments of Columbia Gas Transmission Corp.); id. at 205-10 (Comments of Union Pacific Resources Company).
 
 
 33
 The Commission is also somewhat assisted here by Sec. 19 of the Natural Gas Act, 15 U.S.C. Sec. 717r (1988), which requires persons seeking judicial review to apply first for rehearing before the Commission. As a result, Commission decisions have a somewhat contingent character until rehearing applications are addressed or time-barred. While we do not suggest that the availability of rehearing under Sec. 19 can justify a total failure to afford initial notice, it helps in a case of ambiguity or partial incompleteness. See Common Carrier Conference v. United States, 534 F.2d 981, 983 (D.C.Cir.1976) (noting agency consideration of issue on petition for reconsideration). We believe that the combination--a marginal initial notice, the fact that several affected parties (including a petitioner) spotted the issue, and the opportunity for further vetting of the issue in the rehearing application phase--is enough, if only barely so. "To remand would be an idle and useless formality." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969) (plurality opinion).
 
 
 34
 * * *
 
 The petition for review is
 
 35
 Denied.
 
 
 
 [1]
 A recent amendment to Sec. 29 allows the credit for "tight formation" gas that is not subject to NGPA controls, but only as to gas produced after December 31, 1990. See below at pp. 256-257
 
 
 [2]
 An explicit reference to expectations in the legislative history states that the bill "offers some protection to investors who committed capital to natural gas production under the expectation of continued price control." S.Rep. No. 39, 101st Cong., 1st Sess. at 13 (1989) (emphasis added). The apparent focus on producers may be because contracts have commonly provided for escalation of prices to the highest applicable ceiling price (or to the highest "just and reasonable" rate, later construed to encompass NGPA ceilings, see, e.g., South Dakota Public Utilities Commission v. FERC, 934 F.2d 346 (D.C.Cir., 1991)). Thus price ceilings may give a producer a contract right to a higher price than it could otherwise secure under its sales contract. Compare FERC v. Martin Exploration Mgt. Co., 486 U.S. 204, 208, 108 S.Ct. 1765, 1768, 100 L.Ed.2d 238 (1988)
 
 
 [3]
 See note 2 above
 
 
 [4]
 The parties have left us in the dark as to how much otherwise price-controlled "tight formation" gas is actually at stake here. Martin Exploration upheld the Commission's decision that "new tight formation gas" (i.e. gas from tight formation wells drilled after enactment of the NGPA), see 18 CFR Sec. 274.205(e)(1) (1990), was decontrolled, since that gas by definition qualifies for deregulated treatment. See Martin Exploration, 486 U.S. at 211-13, 108 S.Ct. at 1770-71. The only tight formation gas left subject to price controls is evidently "recompletion tight formation gas". See id. Sec. 274.205(e)(2); Deregulation and Other Pricing Changes on January 1, 1985, Under the Natural Gas Policy Act, 49 Fed.Reg. 46,874, 46,880 n. 18 (1984). In any event, by 1988 all price-controlled Sec. 107 gas had evidently dwindled to less than one percent of total price-controlled gas sales. See Petitioners' Statutory Addendum at 175 (submission of Energy Information Administration to House Subcommittee on Energy and Power)